IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEFFREY LADRAE WILLIAMS,<br><br>Defendant. | Case No. 1:25-MJ-236<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF
A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Sarah Katz-Rowland, being first duly sworn, hereby depose and state as follows:

### I.  INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent with the Department of Veterans Affairs ("VA"), Office of Inspector General ("OIG"), Office of Investigations. I have been employed as a Special Agent with VA OIG since July 2019, assigned to the Washington, D.C. office. As part of my duties, I investigate violations of law that affect the programs and operations of the Department of Veterans Affairs. I have successfully completed the Criminal Investigators Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I also hold a master's degree in criminal justice from the University of Massachusetts, Lowell. During my career as a law enforcement officer, I have participated in numerous criminal investigations related to education benefits fraud, as well as offenses involving forged and falsified documents. Over the course of my career as a Special Agent, I have been the case agent in over 100 investigations. I have conducted fraud-related interviews of witnesses and subjects and have participated in the execution of search and seizure warrants of businesses, residences, and e-mail accounts. Based on my personal training and experience, and discussions with other VA OIG Special Agents with whom I work, I am familiar

1

with the rules and regulations governing VA education benefits, the methods used to commit education benefits-related fraud against the United States, and the documents and other records that frequently evidence such fraud.

2.  I make this affidavit in support of a criminal complaint and arrest warrant charging that, JEFFREY LADRAE WILLIAMS (hereinafter "WILLIAMS") did knowingly and intentionally commit wire fraud, in violation of Title 18, United States Code, Section 1343. Specifically, as set forth below, there is probable cause to believe that, from in or about July 2022 and continuing through at least May 2024, in the Eastern District of Virginia (hereinafter "EDVA") and elsewhere, WILLIAMS knowingly and intentionally devised a scheme to defraud and to obtain money from the VA by means of materially false and fraudulent pretenses, representations, and promises, and caused interstate wire communications to be transmitted in furtherance of the scheme.

3.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all of my knowledge about this matter. The facts and information contained in this affidavit are based on my personal observations, my training and experience, information obtained from various law enforcement personnel, witnesses, and business records. All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person.

4.  Unless otherwise indicated, the statements contained in this affidavit are based in part on my investigation – including my personal observations and review of records, documents, and other evidence – as well as information provided by other investigators and witnesses. All dates are alleged to be on or about the dates stated below.

## II.     VETERANS AFFAIRS EDUCATIONAL ASSISTANCE

5. At all times relevant to defendant's criminal conduct, the U.S. Department of Veterans Affairs was an agency of the United States that provided education, health, and other benefits to veterans of the U.S. Armed Forces and other qualified persons (hereinafter, collectively referred to as "veterans").

6. The Veteran Rapid Retraining Assistance Program ("VRRAP") and Veteran Employment Through Technology Education Courses ("VET TEC") were VA-funded and VA-administered programs that paid for housing, tuition, and related costs for eligible veterans to receive education and training to obtain employment in information technology and other high-demand fields.

7. Through these programs, the VA paid tuition costs directly to private educational institutions that would provide education and training in high-demand fields to veterans. These institutions were required to have their educational programs approved by the VA for participation in the VRRAP and VET TEC programs. Once approved, the institutions could claim tuition payments from the VA on a pay-for-performance schedule, meaning that tuition payments were made by the VA upon certification that certain milestones had been completed: (1) the veteran's enrollment in the program; (2) the veteran's completion of the program; and (3) the veteran's full-time employment in a program-related field within 180 days of completing the program. Upon receipt of these certifications, the VA sent tuition payments directly to the educational institutions, while housing and other expenses were paid directly to eligible veterans enrolled in the programs.

8. Each institution was required to designate one or more employees as School Certifying Officials ("SCOs"), who would be responsible for, among other things, certifying to the VA the institution's compliance with the programs' rules on an ongoing basis. SCOs were responsible for completing and transmitting certification forms and related documents to the VA.

For VET TEC participants, the VA also required the institution to submit the employment offer letter that the veteran had received from their new employer.

9. Under VRRAP and VET TEC, in order to receive the final tuition payment for each veteran, the educational institution was required to provide the VA with an Employment Certification form, certifying, under penalty of perjury, that the veteran received employment in a program-related field within 180 days of completing the program. Section I of the VA's Employment Certification form asked for information related to the veteran's new employment, including the employer's name and address; the name and contact information of the veteran's direct supervisor; and the veteran's title, salary, schedule, hire date, and start date. The form explicitly stated that this section should be completed by the veteran, and the veteran had to sign and date that section after completing it. Section II of the form was supposed to be completed and signed by one of the educational institution's SCOs, certifying that all of the information listed was accurate. Directly above the veteran's signature line and certifying official's signature line was the following warning: "I understand that by submitting this certification, I am making a statement to the government for the purpose of obtaining federal benefits. Section 1001 of Title 18 of the U.S. Code makes it a criminal offense for any person to knowingly and willfully make false or fraudulent statements to any department or agency of the United States government."

10. Upon completion, the institution would typically email the Employment Certification form and any supporting documents to a centralized electronic mailbox for processing. Upon approval, the VA would issue the final payment of tuition and fees to the institution.

11. Under the VET TEC program, the VA gave "preferred provider" status to qualified institutions that agreed to reimburse the VA for the tuition costs of any student who successfully completed their program but did not find full-time meaningful employment in the field of study of

4

the program within 180 days of completing the program. This preferred status exempted the institution from some program rules, as well as tuition and fees caps, among other benefits.

### III. RELEVANT INDIVIDUALS AND ENTITIES

12. School A was a for-profit educational institution incorporated under the laws of Virginia, with its principal place of business in McLean, VA. School A was previously called School B, but changed its name in October 2023. This affidavit will describe conduct that occurred both before and after October 2023, meaning that some of the conduct described herein occurred while the company was still called School B. In the interest of brevity, this affidavit will refer to School A and its predecessor School B simply as "the School."

13. The School represented to the VA and the public that it was a provider of information technology training and educational instruction in cybersecurity and related fields. The School's website indicated that it provided "hands-on training with top instructors." It further stated that the School "has relationships with hundreds of IT recruiters" and "more than a thousand [School] graduates have been hired by employers in Virginia and metropolitan Washington, D.C."

14. The School was approved by the VA to receive VET TEC tuition assistance funds for a "Cyber Defender" program. The School offered a full-time, 8-week version and a part-time, 15-week version. The tuition and fee amount for these programs was up to $21,300, depending upon situations such as deductions for prior student credit. According to the veteran student enrollment documents provided to the VA and in accordance with the pay-for-performance VET TEC model, the School billed the VA 25% of the total amount upon enrollment of each student, 25% if the student completed the program, and the remaining 50% if the student obtained meaningful employment in a program-related field within 180 days of completing the program. The School elected to be a "preferred provider" under the VET TEC program. This meant that, for every veteran who did not receive a program-related job within 180 days of graduating from the

School's VET TEC program, the School would have to repay the VA for the enrollment (25%) and graduation (25%) payments it had made to the School for that veteran. And, of course, the School would not receive the final payment (50%) for that veteran.

15. In addition, the School was also approved by the VA to receive VRRAP funds for the Cyber Defender program. The tuition and fee amount for the program was up to $21,300 or $23,300, depending upon situations such as deductions for prior student credit. In accordance with VRRAP program rules, the School billed the VA 50% of the total amount upon enrollment of each student, 25% if the student completed the program, and the remaining 25% if the student obtained meaningful employment in a program-related field within 180 days of completing the program.

16. WILLIAMS was employed by the School from at least August 2017 through July 2024. From approximately August 2017 to sometime in 2022, WILLIAMS worked as a Placement Specialist. WILLIAMS' responsibilities included helping veterans find jobs after they completed the Cyber Defender program. From at least July 2022 to at least July 2024, WILLIAMS was as a Career Services Manager and SCO. As an SCO, WILLIAMS regularly prepared Employment Certification forms and supporting documents for submission to the VA to obtain tuition payments under the VRRAP and VET TEC programs.

### IV. PROBABLE CAUSE

17. I respectfully submit that there is probable cause to believe that WILLIAMS was engaged in a criminal scheme to defraud and obtain money from the VA by submitting fraudulent documents and making false claims for tuition payments under the VRRAP and VET TEC programs.

18. WILLIAMS executed the scheme by fabricating employment offer letters and forging veterans' signatures on employment certification forms that falsely represented to the VA that the veterans obtained meaningful employment following the completion of the Cyber Defender

6

program, and caused the VA to disburse funds to his employer, when, in truth, the veterans had not obtained such employment. During the investigation, VA OIG identified hundreds of false documents that WILLIAMS submitted or caused to be submitted to the VA, which fraudulently claimed more than $2.9 million in tuition payments on behalf of his employer.

### A. Email Communications in Furtherance of the Scheme

19. According to VA records, during the relevant time period, the Employment Certification forms bore the signature of either WILLIAMS or another SCO at the School (hereinafter referred to as "Coworker"). These Employment Certification forms and job offer letters were submitted to the VA by email—either from WILLIAMS' work email account or Coworker's work email account. These were interstate wire communications, transmitted from computers located in the Eastern District of Virginia to the VA officials responsible for administering the VRRAP and VET TEC Programs in New York and Oklahoma.

20. Between October 2023 and February 2024, sixteen veterans who had enrolled at the School in VET TEC-approved programs submitted complaints to the VA. In these complaints, the veterans stated that they had received notifications from the VA acknowledging that the veterans had found meaningful employment following the completion of their program at the School. The veterans complained that this was incorrect, and that they had *not* found meaningful employment. VA records show that VA Forms 22-10201, Employment Certification, and job offer letters for all sixteen veteran complainants were sent to the VA from Coworker's work email account.

21. Fifteen of those complainants were interviewed by law enforcement, and they stated that the Employment Certification documents submitted by the School on their behalf were fraudulent. They reported that they did not obtain the employment listed on the Employment Certification form and that their signature on the form was forged.

7

22.     After discovering that false employment information had been provided to the VA, at least two veterans contacted WILLIAMS. In one case, in or around February 2024, a veteran with the initials D.J. reported to the VA that s/he spoke with WILLIAMS by telephone, and that WILLIAMS stated that the employment information submitted to the VA for D.J. was supposed to be for a different student with the same name. Law enforcement's review of the School's records reveals that they did not have two veterans with that name. Furthermore, the School did not supplement or correct its Employment Certification for D.J. after D.J. reported the discrepancy to WILLIAMS.

23.     Emails between WILLIAMS, other School officials, veterans, and the VA indicate that WILLIAMS was the main point of contact for veterans to discuss their employment matters. The emails show that WILLIAMS' job duties included maintaining contact with veterans who had completed the Cyber Defender program, learning whether they had obtained program-related employment within 180 days, and ensuring that they completed the Employment Certification forms if they had obtained that employment. Then, WILLIAMS was supposed to provide the forms (and any required job offer letters) to Coworker, who would review them, sign them, and email them to the VA, copying WILLIAMS on the email. In Coworker's absence, WILLIAMS emailed the forms to the VA himself.

24.     The emails show that WILLIAMS repeatedly sent Coworker documents that were purportedly completed and signed by the veterans, but that actually originated with WILLIAMS. The emails contain no record of these documents being sent to WILLIAMS by the veterans before WILLIAMS provided them to Coworker for submission to the VA. In addition, when interviewed, the veterans told investigators that they did not complete or sign the forms submitted to the VA on their behalf, and that they had not obtained the employment listed on them.

25. Furthermore, the investigation revealed instances in which WILLIAMS manipulated emails that he had received from veterans to make Coworker believe that the veterans had obtained employment. For example, the emails show that one of the veterans sent an email to WILLIAMS only, explaining that s/he had not obtained employment. Then, WILLIAMS forwarded that email to Coworker. However, in the forwarded version of the email that Coworker received, the veteran's explanation that s/he *had not* obtained employment was altered, and now stated that the veteran *had* obtained employment. By forwarding this altered version of the email to Coworker, WILLIAMS was providing fraudulent support for his claim that this veteran had received employment.

### *False Documents Submitted to VA Concerning Veteran A.T.*

26. On January 23, 2024, at 3:22 p.m., Coworker copied WILLIAMS and emailed the VA employment verification documents for a veteran, A.T., who completed the Cyber Defender program in December 2023. The VA responded at 4:06 p.m., informing Coworker, WILLIAMS, *and A.T.* that the employment certification package could not be accepted because an employment offer letter was missing.

27. A.T. provided documents to law enforcement showing that WILLIAMS immediately sent him/her an email at 4:06 p.m., telling A.T. to disregard the VA's email because "[t]hey have the wrong student." According to VA records, at 4:18 p.m., Coworker and WILLIAMS resubmitted the employment verification documents for A.T. to the VA via email.

28. VA OIG agents conducted an interview of A.T., who confirmed that s/he did not fill out or sign the Employment Certification form, s/he never received the job offer letter, and never worked at the employer listed on the Employment Certification form.

### B.     Information from Employers

29.    Information from 20 employers, which were listed on the Employment Certification forms submitted to the VA on behalf of the School, verified to VA OIG that approximately 148 of the Employment Certification forms submitted by the School were false because those veterans did not obtain employment with those employers within 180 days after they completed the Cyber Defender program.

30.    For example, Coworker and WILLIAMS submitted Employment Certification documents to the VA indicating that approximately 40 veterans were employed at one particular company ("Company") between January and May 2024. On July 24, 2024, VA OIG agents conducted an interview of an employee at Company, whose name was listed as the Company point of contact on Employment Certification documents that were submitted by Coworker and WILLIAMS. That employee stated that he is not aware of any veterans from the School being employed at Company in 2024.

## V. CONCLUSION

31. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that from at least in or about July 2022 to at least in or about May 2024, WILLIAMS knowingly and intentionally engaged in a scheme to defraud, and that, during that time, WILLIAMS caused false representations in furtherance of this scheme to be sent by means of interstate wire communication beginning or ending in EDVA, in violation of Title 18 U.S.C. § 1343 (Wire Fraud). Therefore, I respectfully request that an arrest warrant be issued for WILLIAMS.

*Sarah Katz-Rowland*
Sarah Katz-Rowland
Special Agent
Veterans Affairs OIG

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 this 14th day of April 2025.

*William E. Fitzpatrick*
Honorable William E. Fitzpatrick
United States Magistrate Judge
Eastern District of Virginia